# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**MARCUS RICHARDSON (#628267)**

**VERSUS**

**DARREL VANNOY, ET AL.**

**CIVIL ACTION**

**NO. 19-634-SDD-SDJ**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law, and recommendations therein.  Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August 19, 2022.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**MARCUS RICHARDSON (#628267)**

**VERSUS**

**DARREL VANNOY, ET AL.**

**CIVIL ACTION**

**NO. 19-634-SDD-SDJ**

## REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, Petitioner's application should be denied. There is no need for oral argument or for an evidentiary hearing.

Petitioner Marcus Richardson challenges his conviction for second-degree murder, entered in 2014 in the Eighteenth Judicial District Court for the Parish of West Baton Rouge, State of Louisiana. On September 18, 2019, Petitioner filed a petition for a writ of habeas corpus contending: (1) insufficient evidence to support his conviction, (2) ineffective assistance of trial counsel, and (3) ineffective assistance of appellate counsel.[1]

## I.    PROCEDURAL HISTORY

After a trial by jury conducted in July of 2014, Petitioner was found guilty of second-degree murder. On September 9, 2014, Petitioner was sentenced to life imprisonment without the possibility of probation, parole, or suspension of sentence.[2] Petitioner thereafter appealed his conviction to the Louisiana First Circuit Court of Appeal. On November 9, 2015, the First Circuit

---

[1] R. Doc. 1, pp. 4-9; R. Doc. 13, pp. 87-89.
[2] R. Doc. 10, pp. 110.

affirmed Petitioner's conviction and sentence.[3]  The Louisiana Supreme Court denied review on February 19, 2016.[4]

On or about December 12, 2016, Petitioner filed an application for post-conviction relief in the Eighteenth Judicial District Court, asserting claims of ineffective assistance of trial and appellate counsel.[5]  The trial court denied the application on the merits on January 9, 2017.[6] Petitioner filed a Notice of Intent on January 27, 2017, seeking a return date to file a writ application with the First Circuit.[7] When Petitioner failed to receive a response to his request for a return date, he filed a Motion for Contradictory Hearing on June 2, 2017.[8] The trial court granted relief and extended the return date for Petitioner to file a writ with the First Circuit until September 23, 2017.[9] Petitioner filed a writ application with the First Circuit, which was denied on February 5, 2018.[10] The Louisiana Supreme Court subsequently denied review on April 22, 2019.[11]

On or about September 18, 2019, Petitioner filed the instant application for habeas corpus relief in this Court.

## II.    FACTUAL BACKGROUND

The facts, as summarized by the First Circuit, are as follows:

> On May 13, 2012, between 10:30 p.m. and 11:00 p.m., Petitioner was at the BP gas station at the La. Hwy. 1 Truck Plaza in Port Allen, Louisiana. Petitioner, who was with his cousin, Ronderick Freeman, had parked at pump six. Several other people arrived at the gas station and parked at different pumps. Kietrick Spriggs and Devin Picou got out of a red Impala parked at pump three and walked toward the gas station convenience store. Petitioner, who was standing somewhere between the fourth and fifth pumps, exchanged words with Spriggs. Spriggs, not wanting any trouble, walked back to the car. Picou continued to

---

[3] R. Doc. 13, p. 17-38.
[4] R. Doc. 13, p. 39.
[5] R. Doc. 13, pp. 40-62.
[6] R. Doc. 13, p. 72.
[7] R. Doc. 13, pp. 105-106.
[8] R. Doc. 13, pp. 73-75.
[9] R. Doc. 13, p. 117.
[10] R. Doc. 13, pp. 118-166; 313-314.
[11] R. Doc. 13, pp. 333-335.

walk inside the store. When Picou left the store and walked past Petitioner, he and Petitioner exchanged words, then began fist-fighting. At the same time, Freeman confronted Dexter Allen. Allen had earlier parked his tan Camry at the second pump and gotten out of his car. Freeman swung at Allen and missed. Allen countered and knocked Freeman to the ground. Freeman appeared to be unconscious and remained on the ground throughout Petitioner's fight (and the shooting). Part of the Petitioner's fight with Picou and Allen striking Freeman were captured by several surveillance cameras at the gas station.

As Petitioner and Picou fought, they moved toward the air pump on the south side of the convenience store (away from any camera angle). Either from being hit or tripping on the curb by the air pump, Petitioner fell down. Because Petitioner was down, Picou stopped fighting and walked away. At this point, Jamel Askins approached the prostrate Petitioner and began punching him. Askins was in the gray (or silver) Impala, driven by John Lee, who had parked at pump one. D'Sean Williams and Justin Warner were also passengers in the gray Impala and were standing near the vehicle at the time the fights started. Williams and Warner were cousins.

As Askins was hitting Petitioner, Petitioner was reaching for his gun in his left pocket. Askins began wrestling with Petitioner to prevent him from obtaining the gun. Petitioner managed to retrieve a .40 caliber Glock 23 handgun from his front left pocket and fire two shots at who he perceived to be his attackers. No one was struck. Askins ran from Petitioner toward the highway (in the direction of the gas pumps) and told everyone else to run. Most people in the parking lot scattered toward the highway. Warner ran to the side of the gray Impala and crouched down. Petitioner walked across the parking lot to the side of the Impala where Warner was hiding and shot him five times. Warner was struck in the chest and abdomen and died from his injuries shortly thereafter.

Petitioner lifted Freeman off the ground and walked him to his (Petitioner's) car. Petitioner left the gas station parking lot with his cousin and was stopped by the police on the service road, before getting to the interstate.

Petitioner provided two videotaped statements to the police, one to Detective Tommy Schiro and one to Detective Kevin Cyrus, both with the West Baton Rouge Parish Sheriff's Office.[12] Petitioner admitted in both statements that he shot Warner. Petitioner stated that as he approached Warner, Warner was on the ground, crawling (in a sitting position) away from him, telling Petitioner that it was not him. Petitioner said he shot Warner because he "knew" that the person on the ground was the person who had just attacked him (presumedly Askins). Petitioner also insisted in his statements that he shot his victim one

---

[12] Petitioner gave a statement to Detective Schiro. Petitioner then gave a statement to Detective Cyrus. During this statement, Detective Cyrus stopped questioning and brought Petitioner to the crime scene to better explain what happened. This crime scene walk through was recorded. Detective Cyrus then took Petitioner back to the police station and continued the interview.

time. The defense at trial established that Askins and Warner were both wearing green shirts.

The defendant did not testify at trial.[13]

### III.  TIMELINESS

The Court concludes that Petitioner's application for habeas corpus relief is timely. Pursuant to 28 U.S.C. § 2244(d), there is a one-year statute of limitations applicable to federal habeas corpus claims brought by prisoners in state custody.  This limitations period begins to run on the date that the judgment becomes final through the conclusion of direct review or through the expiration of time for seeking such review.  As a result, after a ruling by the state's highest court on direct appeal, a petitioner's judgment becomes final when the United States Supreme Court issues a decision denying discretionary review or, if no application for review is made, upon the conclusion of the 90-day time period for seeking such review.[14]

The State argues that Petitioner's habeas petition is untimely because he appealed the denial of his post-conviction application to the First Circuit outside of the thirty-day deadline.[15] However, the record reflects that Petitioner sought and obtained an extension of the return date when the trial court failed to respond to his original request. Neither the First Circuit nor the Louisiana Supreme Court rejected Petitioner's writ applications as untimely. Accordingly, Petitioner's post-conviction application remained pending and tolled the statute of limitations from the time it was filed on December 12, 2016, until the Louisiana Supreme Court denied certiorari on April 22, 2019.[16]

---

[13] *State v. Richardson,* 2015-0746 (La. App. 1 Cir. 11/9/15), 2015 WL 6951573.
[14] *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th. Cir. 2003).
[15] R. Doc. 14, p. 7.
[16] *See Sullivan v. LeBlanc*, 2021 WL 1186629, at *3 (M.D. La. Feb. 22, 2021).

Petitioner's conviction became final on May 19, 2019, ninety days after the Louisiana Supreme Court denied review on Petitioner's direct appeal. Thereafter, approximately 207 days elapsed before Petitioner filed his post-conviction application on December 12, 2016. As discussed above, the statute of limitations remained tolled until the Louisiana Supreme Court denied certiorari on April 22, 2019.

Approximately 149 days passed between the denial of Petitioner's writ application by the Louisiana Supreme Court and the filing of the instant petition on September 18, 2019. This results in a total of 356 days during which Petitioner did not have any properly filed application for post-conviction or other collateral relief pending before the state courts. Accordingly, because less than a year elapsed during which Petitioner did not have any properly-filed applications for post-conviction or other collateral review pending before the state courts, Petitioner's application is timely.

## IV. EXHAUSTION

Next, the State argues that Petitioner failed to exhaust his administrative remedies because the trial court dismissed his post-conviction application without a hearing. Under 28 U.S.C. § 2254(b) and (c), a claimant seeking habeas corpus relief in federal court is required first to exhaust his claims by presenting them for review before the courts of the state in which he is confined. The exhaustion requirement is satisfied only when a petitioner's claims have been properly presented to the state's highest court, either on direct review or on post-conviction attack.[17] As a general rule, federal habeas corpus relief is available on a habeas petition only when all of the claims in the petition have been exhausted through the state courts. In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional

---

[17] *Bufalino v. Reno,* 613 F.2d 568, 570 (5th Cir. 1980).

claims to the state courts "in a procedurally proper manner according to the rules of the state courts."[18] Each claim must be presented to the state's highest court, even when review by that court is discretionary.[19]

The record reflects that the trial court reviewed Petitioner's post-conviction application on the merits and did not dismiss it for failure to comply with any applicable state procedural rules.[20] The record also reflects that Petitioner fairly presented all three claims to the trial court, First Circuit, and Louisiana Supreme Court. Claim 1 was presented on direct appeal[21] and Claim 2[22] and Claim 3[23] in his post-conviction application. The State's exhaustion argument is without merit.

## V.    MERITS REVIEW

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   Relief is authorized if a state court has arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court has decided a case differently than the Supreme Court on a set of materially indistinguishable facts.[24]

Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision

---

[18] *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).
[19] *Wilson v. Foti*, 832 F.2d 891, 893–94 (5th Cir. 1987).
[20] R. Doc. 13, p. 72.
[21] R. Doc. 13, pp. 7-15.
[22] R. Doc. 13, pp. 84-87.
[23] R. Doc. 13, pp. 87-89.
[24] *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

based on an unreasonable factual determination.[25] Mere error by the state court or mere disagreement on the part of this Court with the state court determination is not enough; the standard is one of objective reasonableness.[26] State court determinations of underlying factual issues are presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence.[27]

### *Claim 1: Insufficient Evidence*

In Claim 1, Petitioner asserts that his conviction was based on insufficient evidence. He contends that the First Circuit unreasonably applied *Jackson v. Virginia*, 433 U.S. 307 (1979), to the facts of his case. Specifically, Petitioner contends that the facts support a conclusion that the homicide was committed "in safety to himself or 100% in sudden passion or heat of blood."[28] The First Circuit reviewed the sufficiency of the evidence for Petitioner's second-degree murder conviction in detail:

> In the related counseled assignments of error, the defendant argues, respectively, the trial court erred in denying the motion for post-verdict judgment of acquittal/new trial, and the evidence was insufficient to support the conviction for second degree murder. Specifically, the defendant contends he is guilty of manslaughter because of the presence of the mitigating factors of sudden passion or heat of blood at the time of the killing. In his pro se assignments of error, the defendant argues, respectively, that he killed Warner in self-defense, and alternatively, the State proved he committed only manslaughter or negligent homicide.
>
> A conviction based on insufficient evidence cannot stand as it violates Due Process. *See* U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See* La. C. Cr. P. art. 821(B); *State v. Ordodi,* 06–0207, p. 10 (La.11/29/06),

---

[25] *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).
[26] *Id. See also Williams*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").
[27] 28 U.S.C. § 2254(e)(1).
[28] R. Doc. 1, p. 7.

946 So.2d 654, 660; *State v. Mussall* 523 So.2d 1305, 1308–09 (La.1988). The *Jackson* standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. *See State v. Patomo,* 01–2585, p. 5 (La.App. 1st Cir.6/21/02), 822 So.2d 141, 144.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Guilty of manslaughter is a proper responsive verdict for a charge of second degree murder. La. C. Cr. P. art. 814(A)(3). Louisiana Revised Statutes 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the factfinder finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. *State v. Maddox,* 522 So.2d 579, 582 (La.App. 1st Cir.1988). Manslaughter requires the presence of specific intent to kill or inflict great bodily harm. See *State v. Hilburn,* 512 So.2d 497, 504 (La.App. 1st Cir.), *writ denied,* 515 So.2d 444 (La.1987).

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. *State v. Cousan,* 94–2503, p. 13 (La.11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of defendant. *State v. Graham,* 420 So.2d 1126, 1127 (La.1982). Deliberately pointing and firing a deadly weapon at close range are circumstances that support a finding of specific intent to kill. *State v. Broaden,* 99–2124, p. 18 (La.2/21/01), 780 So.2d 349, 362, cert *denied,* 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. *State v. McCue,* 484 So.2d 889, 892 (La.App. 1st Cir.1986).

In his counseled brief, the defendant does not deny that he shot Warner; nor does he contest that he had the specific intent to kill. Instead, according to the defendant, believing that Warner was the person who attacked him, he "lost it" and shot Warner multiple times "in the heat of blood." The defendant suggests that "emotions were heightened" for him after having been attacked by Askins; thus, given Warner's and Askins's similar builds and that they were wearing similar green shirts and jeans, the defendant in "a fit of rage after being attacked," retrieved his gun and immediately went after the individual who attacked him.

9

It is the defendant who must establish by a preponderance of the evidence the mitigating factors of sudden passion or heat of blood to reduce a homicide to manslaughter. *See State ex rel. Lawrence v. Smith,* 571 So.2d 133, 136 (La.1990); *State v. LeBoeuf,* 06–0153, p. 5 (La.App. 1st Cir.9/15/06), 943 So.2d 1134, 1138, *writ denied,* 06–2621 (La.8/15/07), 961 So.2d 1158. *See also Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Further, the killing committed in sudden passion or heat of blood must be immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Thus, the evidence at trial had to establish that the provocation was such that it would have deprived an average person of his self-control and cool reflection.

There was no testimony or physical evidence that Warner physically provoked the defendant in any way. The defendant did not testify at trial, and there were no witnesses for the defense. Thus, the defense did not establish the mitigating factors of sudden passion or heat of blood during the night of the shooting. Our review of the gas station videotape that captured some of the fighting and the shooting revealed that Warner was not near the defendant when either of the fights with the defendant occurred. When the defendant fired the first two shots while he was next to the air pump, anyone who was within proximity of the defendant ran away. In his statement, the defendant said that he saw Warner (who the defendant ostensibly thought was Askins) pass through the inside of the Impala at pump one. Thus, according to the defendant, Warner may have armed himself by grabbing a weapon from the car. It appeared from our review of the gas station videotape, however, that Warner simply ran around the Impala and ducked down on the side of it, apparently to avoid getting shot, as well as to avoid being seen. Detective Cyrus, the lead detective with the West Baton Rouge Sheriff's Office, indicated on cross-examination that since the camera lost sight of Warner, it was possible that Warner got into the silver (gray) Impala and went out the other side. On redirect examination, however, the prosecutor looked at the relevant footage with Detective Cyrus and suggested that Warner could be seen on the camera and that he never went inside of a car before being shot. Detective Cyrus agreed with the prosecutor.

The defendant also said in his statement that, as Warner was on the ground moving away, he (Warner) was reaching behind him in his back pocket. In any event, the jury could have chosen to disregard both of these self-serving remarks (as to Warner passing through the inside of the car and reaching for something while on the ground) of the defendant. Moreover, even had Warner been reaching for something, perhaps a weapon, it would have been a move (by Warner) in self-defense. The defendant tracked down Warner and pointed his gun at him, while Warner repeatedly insisted that he was not the one. According to the defendant in his pro se brief, when he repeatedly shot a retreating, defenseless Warner at this moment, he did so out of self-defense.

When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in

self-defense. *State v. Spears,* 504 So.2d 974, 978 (La.App. 1st Cir.), *writ denied,* 507 So.2d 225 (La.1987). A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21. The guilty verdict of second degree murder indicates the jury accepted the testimony of the prosecution witnesses insofar as such testimony established that the defendant did not kill Warner in self-defense. *See Spears,* 504 So.2d at 978.

The jurors clearly did not believe the defendant's claim of self-defense. They may have determined the aggressor doctrine applied, since the defendant escalated the conflict by arming himself. *See State v. Loston.* 03–0977, p. 10 (La.App. 1st Cir.2/23/04), 874 So.2d 197, 205, *writ denied,* 04–0792 (La.9/24/04), 882 So.2d 1167. He then chose to walk across the parking lot and shoot Warner, who was unarmed, at point-blank range. The jury may have determined the defendant did not reasonably believe he was in imminent danger of losing his life or receiving great bodily harm when he shot Warner and did not act reasonably under the circumstances. *See Loston,* 03–0977 at p. 11, 874 So.2d at 205. With his gun in hand and having caused everyone near him to scatter by firing twice, the defendant could have simply walked away and called the police. In any event, a rational trier of fact could have reasonably concluded that the killing was not necessary to save the defendant from the danger envisioned by La. R.S. 14:20(1) and/or that the defendant had abandoned the role of defender and taken on the role of an aggressor and, as such, was not entitled to claim self-defense. *See* La. R.S. 14:21; *State v. Bates,* 95–1513, p. 13 (La.App. 1st Cir.11/8/96), 683 So.2d 1370, 1377.

Moreover, the defendant's actions of leaving the scene after shooting and killing Warner is inconsistent with a theory of self-defense. *See State v. Emanuel–Dunn,* 03–0550, p. 7 (La.App. 1st Cir.11/7/03), 868 So.2d 75, 80, *writ denied,* 04–0339 (La.6/25/04), 876 So.2d 829; *State v. Wallace,* 612 So.2d 183, 191 (La.App. 1st Cir.1992), *writ denied,* 614 So.2d 1253 (La.1993). Flight following an offense reasonably raises the inference of a "guilty mind." *State v. Captville,* 448 So.2d 676, 680 n. 4 (La.1984). In finding the defendant guilty, it is clear the jury rejected the claim of self-defense and concluded that the use of deadly force under the particular facts of this case was neither reasonable nor necessary.

The defendant (in the alternative) claims that he shot Warner in "a fit of rage" because he thought Warner was the person who had just attacked him. The defendant, however, said in his first statement (and his second statement) that he had no idea who he was shooting when he shot Warner, and suggested he shot at Warner because he was the closest one. The defendant also admitted in his first statement that when he pointed his gun at Warner, Warner "was trying to get away." Further, while the defendant indicated in his statements that he did not know Picou or Askins, Askins testified that he knew the defendant.

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. *See State v. Moten,* 510 So.2d 55, 61 (La.App. 1st Cir.), *writ denied,* 514 So.2d 126 (La.1987). It is clear from the guilty verdict that the jury rejected the theory that the defendant was so angry when he shot Warner that he was deprived of his self-control and cool reflection. Questions of provocation and time for cooling are for the jury to determine under the standard of the average or ordinary person with ordinary self-control If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. *State v. Leger,* 05–0011, pp. 92–93 (La.7/10/06), 936 So.2d 108, 171, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).

Regardless of his reasons, the defendant was clearly out of danger of any further harm as everyone had run when he fired two shots. The only person left anywhere near the scene was Warner (and an unconscious Freeman). The defendant could have stayed where he was, gone to his cousin, gone inside the store, driven off in his car, or done any number of things. Evidence introduced at trial indicated, however, that instead of extricating himself from the scene, the defendant walked about eighty feet to get to where Warner was hiding. As the gun-toting defendant bore down on Warner, who was crawling away and pleading not to be shot, the defendant repeatedly shot him. While the defendant likely shot Warner out of retaliation for getting beaten up, the defendant's actions in approaching and shooting a defenseless victim were calculated; and the lack of immediacy from the time Askins stopped hitting the defendant to the moment the defendant shot Warner clearly suggested the defendant was in control of his faculties and knew exactly what he was doing. Thus, even if it was true that the defendant thought he was shooting and killing Askins, under the transferred intent doctrine, the shooting and killing of Warner constituted second degree murder.[29]

Section 2254 habeas relief "on a claim of insufficient evidence is appropriate only 'if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'"[30] All credibility choices and conflicting inferences are to be resolved in favor of the verdict.[31] "A determination of a factual issue made by a state court shall be presumed correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[32] Thus, under the standards of *Jackson* and § 2254,

---

[29] *State v. Richardson*, 2015-0746 (La. App. 1 Cir. 11/9/15), 2015 WL 6951573.
[30] *West v. Johnson,* 92 F.3d 1385, 1393 (5th Cir.1996) (quoting *Jackson v. Virginia,* 443 U.S. 307, 324 (1979)).
[31] *United States v. Cyprian,* 197 F.3d 736, 740 (5th Cir.1999).
[32] 28 U.S.C. § 2254(e)(1).

this Court's review on sufficiency of evidence claims is "twice-deferential."[33] As noted by the First Circuit, considerable evidence was offered at trial that Petitioner was out of danger, and his actions were calculated at the time he killed Warner. This Court cannot disregard the jury's verdict based on Petitioner's more favorable interpretation of the evidence.[34] The Court finds that the First Circuit's conclusion that the evidence was sufficient to support a conviction of second-degree murder was neither contrary to nor an unreasonable application of federal law. Accordingly, Petitioner is not entitled to habeas relief on Claim 1.

### Claim 2: Ineffective Assistance of Trial Counsel

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a petitioner must meet the two-pronged test set forth by the Supreme Court in *Strickland v. Washington*.[35] The petitioner must show that his counsel's performance was both deficient (that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (that errors by counsel "actually had an adverse effect on the defense").[36] The first component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.[37] As to the second component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the

---

[33] *Parker v. Matthews*, 567 U.S. 37, 43 (2012).
[34] Petitioner also appears to argue that there is no evidence that the jury found him guilty on the elements of second-degree murder (R. Doc. 1, p. 6). The jury was instructed on the necessary elements for a conviction of second-degree murder (R. Doc. 12, p. 244). Each juror was polled at the close of trial and all twelve jurors stated that "guilty" of second-degree murder was their verdict (R. Doc. 12, p. 268-270).
[35] 466 U.S. 668 (1984).
[36] *See Anderson v. Collins*, 18 F.3d 1208, 1215 (5th Cir. 1994), citing *Strickland*, 466 U.S. at 686-89, 693.
[37] *Id.*, citing *Strickland*, 466 U.S. at 689.

proceeding. Rather, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[38]

A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.[39] The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[40]

In Claim 2, Petitioner contends that he received ineffective assistance from his trial counsel because he failed to file a motion to recuse prosecutor Tony Clayton. Petitioner alleges that Clayton was related to the victim, Justin Warner. Petitioner bases this allegation on a statement made by Clayton to the jury during voir dire:

> Mr. Clayton:  You know, you heard folks talk about the victim's family and that they're a nice family. I happen to know the Richardson family and they're nice people too. They're good, good people. But do you understand that when this trial starts, its not about my family, the Bynums, this family or this good family the Richardsons? It's not about them. You with me?[41]

Petitioner ties the Bynum family to Justin Warner based on a news article that names Alston Bynum as Warner's uncle.[42]

There is no state opposition to Petitioner's post-conviction application in the record. No post-conviction hearing was held on the factual basis of Petitioner's claim. The post-conviction court issued an order dismissing Petitioner's claim as meritless, but the ruling assumed that Clayton was related to Justin Warner:

> The court finds no merit to the claim of ineffective assistance of counsel based on defendant's claim that his counsel of record failed to request that Assistant District

---

[38] *See Anderson*, 18 F.3d at 1215, citing *Strickland*, 466 U.S. at 693.
[39] *See Harrington v. Richter*, 562 U.S. 86, 104 (2011), citing *Strickland*, 466 U.S. at 689.
[40] *See Harrington*, 562 U.S. at 104, citing *Strickland*, 466 U.S. at 687.
[41] R. Doc. 11, p. 140.
[42] R. Doc. 13, pp. 68-69.

14

> Attorney Antonio Clayton be recused as he is related to the victim, Justin Warner. La.C.Cr.P. Art. 680 states that the District Attorney shall be recused when he, "is related to the party accused or to the party injured…to such an extent that it may appreciably influence him in the performance of the duties of his office." The defendant has failed to state any fact that shows how this relationship in any was influenced Mr. Clayton in the performance of his duties. Additionally, the State of Louisiana was also represented by Assistant District Attorney Scotty Chabert and Becky Chustz. All the direct examination was performed by Mr. Clayton. The closing arguments were conducted by Mr. Clayton and Mr. Chabert.  The jury verdict in this matter was unanimous. All post-trial motions were handled by Mr. Chabert.[43]

As an initial matter, Petitioner has not proven that Tony Clayton is related to Justin Warner. Petitioner has provided evidence that Warner has an uncle named Alston Bynum. He also provided a very ambiguous statement from Clayton during voir dire. A reasonable interpretation of Clayton's statement is that he was not telling the jury he was related to the Bynums.  He was listing exemplar families, including his own, and making the point that the case was not about whether the victim or the perpetrator came from a good family.

Even if Clayton is related to the victim, this statement would not have been sufficient to put Petitioner's attorney on notice that an objection to Clayton's participation in the trial needed to be lodged. Indeed, Petitioner does not allege that he advised his counsel to make an objection after hearing this statement during voir dire. Petitioner also cannot show that he was prejudiced by any assumed familial relationship between Clayton and Warner. He offers pure speculation that Clayton may have suppressed or tampered with evidence[44] but no proof that any actual familial relationship affected the outcome of his trial. Accordingly, the post-conviction court's conclusion that Petitioner's ineffective assistance of trial counsel claim lacks merit is neither contrary to nor an unreasonable application of federal law.

---

[43] R. Doc. 13, p. 72.
[44] R. Doc. 1, p. 8.

15

*Claim 3: Ineffective Assistance of Appellate Counsel*

Claims for ineffective assistance of appellate counsel are also governed by the two-part *Strickland* standard.[45] In order to show prejudice in an ineffective assistance of appellate counsel claim, the petitioner must show that, but for counsel's unprofessional errors, the result of his direct appeal would have been different. Petitioner fails to make that showing here.

Petitioner alleges in Claim 3 that his appellate counsel was ineffective because she failed to adequately argue that manslaughter was the appropriate verdict based on "provocation."[46] This appears to be a different argument than the one Petitioner made to the post-conviction court,[47] which was that his appellate counsel failed to adequately argue that he killed Justin Warner in the heat of passion before his blood had time to cool.[48] The post-conviction court dismissed the claim, finding:

> The defendant's claim of ineffective assistance of appellate counsel on the mitigating factor of the "time defendant's blood had to cool" was discussed and raised on appeal and therefore has been sufficiently addressed.[49]

The record reflects that Petitioner's appellate counsel did argue that a manslaughter verdict was appropriate because Petitioner was provoked by Mr. Askins immediately before the murder.[50] As noted in the excerpt above, the First Circuit dismissed Petitioner's arguments about provocation because there was no evidence that he was provoked by the victim before the murder. Petitioner's appellate counsel made an argument about provocation in his direct appeal brief, and it was thoroughly addressed by the First Circuit in their opinion affirming his conviction.  Petitioner's ineffective assistance of appellate counsel lacks a factual basis and should be dismissed.

---

[45] *Dorsey v. Stephens,* 720 F.3d 309, 319 (5th Cir.2013).
[46] R. Doc. 1, p. 9.
[47] Although this claim is arguably unexhausted, the Court dismisses it as meritless pursuant to 28 U.S.C. § 2254(b)(2).
[48] R. Doc. 13, p. 57.
[49] R. Doc. 13, p. 72.
[50] R. Doc. 13, p. 14.

## VI.    CERTIFICATE OF APPEALABILITY

Should Petitioner pursue an appeal, a certificate of appealability should also be denied.  An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[51]  Although Petitioner has not yet filed a Notice of Appeal herein, the Court may address whether he would be entitled to a certificate of appealability.[52]  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[53]  In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[54] In the instant case, reasonable jurists would not debate the denial of  Petitioner's application or the correctness of the procedural or substantive ruling. Accordingly, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

## **RECOMMENDATION**

It is recommended that Petitioner's application for habeas corpus relief be denied, and that this proceeding be dismissed.  It is further recommended that, in the event Petitioner pursues an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on August 19, 2022.

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[51] 28 U.S.C. § 2253(c)(1)(A).
[52] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).
[53] 28 U.S.C. § 2253(c)(2).
[54] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).